***********
The Full Commission has reviewed the prior Opinion and Award of Deputy Commissioner Deluca with reference to the errors assigned and has considered the briefs and *Page 2 
arguments before the Full Commission related to the record before Deputy Commissioner Deluca. The Full Commission has also considered the evidence gathered by Deputy Commissioner Homick and the subsequent briefs by both plaintiff and defendants. Based upon all of the evidence presented, the Full Commission enters the following Opinion and Award.
 *********** ISSUES
1. Whether plaintiff is entitled to continued treatment at the Pain Center of Hendersonville and whether defendants must authorize and approve such treatment?
2. Whether plaintiff is entitled to reimbursement for out-of-pocket expenses incurred for emergency department visits?
3. Whether plaintiff is entitled to additional temporary total disability compensation?
 ***********
The Full Commission finds as fact and concludes as a matter of law the following, which the parties entered into at the hearings before the Deputy Commissioners and in the Pre-trial Agreements as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act. At all times relevant to this claim, there was an employee-employer relationship between the parties, and Federated Insurance Company is the carrier.
2. Plaintiff's average weekly wage is $456.30, and his compensation rate is $304.20.
3. On October 5, 2006, plaintiff sustained a compensable work injury to his right foot, ankle, and leg in the course and scope of his employment. *Page 3 
4. At the prior hearing before Deputy Commissioner Deluca, the parties submitted the following:
 a. A Pre-trial Agreement, which was admitted into the record and marked as Stipulated Exhibit One (1);
 b. A packet of time sheets and payroll records, which was admitted into the record and marked as Stipulated Exhibit Two (2);
 c. A surveillance video, which was admitted into the record and marked as Stipulated Exhibit Three (3);
 d. A packet of medical records, which was admitted into the record and marked as Stipulated Exhibit Four (4) and;
 e. A packet of North Carolina Industrial Commission forms and filings.
5. Also admitted into the record in connection with the hearing before Deputy Commissioner Deluca were the depositions of Dr. Richard Broadhurst, Dr. Terrence Fitzgerald, Dr. Andrew Rudins, Dr. William K. McKibbin, Mr. William Todd Neel, and Mr. Doug Larner.
6. At the hearing before Deputy Commissioner Homick, the parties submitted the following:
 a. A Pre-trial Agreement, which was admitted into the record and marked as Stipulated Exhibit One (1);
 b. A packet of medical and rehabilitation reports, which was admitted into the record and marked as Stipulated Exhibit Two (2) and;
 c. A packet of various other documents, which was admitted into the record and marked as Stipulated Exhibit Three (3), and which included the following: *Page 4 
 i. North Carolina Industrial Commission forms and filings;
 ii. Discovery responses;
 ii. The subpoena for Ms. Becky Lathan;
 iv. Photographs of plaintiff's feet;
 v. The prior October 31, 2008 Opinion and Award;
 vi. A surveillance CD/DVD.
7. Also admitted into the record in connection with the hearing before Deputy Commissioner Homick were the depositions of Dr. Jerry Kotulla, Dr. Brian Bothe, Mr. Randy Adams, and Ms. Joan Kennedy.
 ***********
Based upon the competent and credible evidence of record, as well as any reasonable inferences that may be drawn therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before Deputy Commissioner Deluca, plaintiff was forty-six (46) years of age with his date of birth being March 13, 1962. Plaintiff attended school through the eleventh (11th) grade and does not have a general equivalency diploma.
2. Plaintiff's work history consists primarily of heating and air conditioning installation.
3. On October 5, 2006, plaintiff was performing his job as a heating and air conditioning installation mechanic for defendant-employer when he fell from a ladder and sustained an injury to his back, right foot, ankle, knee and leg. His right foot hit a hanging wire as he fell. Defendants admitted the compensability of this injury through the filing of a Form 60 on October 18, 2006. *Page 5 
4. On October 9, 2006, plaintiff sought treatment from Dr. Eric Weiner and reported experiencing significant pain in his knee, right calf and ankle, and right lower back. Dr. Weiner noted that the October 5, 2006 emergency room x-rays of plaintiff's ankle, knee, back, and leg were negative. Dr. Weiner also noted an abrasion on plaintiff's anterior tibia region. Following his examination, Dr. Weiner diagnosed plaintiff as having right lower back, ankle, and lower leg sprains. Dr. Weiner indicated that plaintiff was unable to ambulate adequately and medically excused him from work for at least twelve (12) days. Dr. Weiner also prescribed Naprosyn and Darvocet.
5. On October 16, 2006, Dr. Weiner reported that plaintiff continued to experience pain and was unable to walk without crutches. At that time, Dr. Weiner concluded Darvocet was not sufficiently effective in relieving plaintiff's pain, referred him for a second opinion from an orthopaedist, and prescribed Percocet.
6. On October 17, 2006, plaintiff was examined by Dr. Tally H. Eddings upon the referral of Dr. Weiner. Dr. Eddings reviewed plaintiff's x-rays and diagnosed him as having contusions for which he recommended rest, ice, elevation, and progression to restricted weight-bearing activities. In response to a request by plaintiff, Dr. Eddings prescribed a wheelchair, but asked plaintiff to use it sparingly. Plaintiff's symptoms continued and on November 2, 2006, Dr. Eddings recommended that he be evaluated by a foot and ankle specialist in his practice, Dr. Mark R. Hedrick.
7. Plaintiff continued to treat with Dr. Weiner. On November 20, 2006, plaintiff underwent an MRI of his right foot that revealed no acute fracture or mal-alignment, minimal ankle effusion, and no significant degenerative changes. On November 27, 2006, Dr. Weiner referred plaintiff to Southeastern Sports Medicine for further evaluation. *Page 6 
8. On December 5, 2006, plaintiff was examined by Dr. William K. McKibbin of Blue Ridge Bone Joint Clinic for evaluation of his right foot and ankle pain. Dr. McKibbin diagnosed plaintiff as having right foot and ankle complex regional pain syndrome. For plaintiff's condition, Dr. McKibbin noted that he could offer no treatment except for a short CAM walker boot to enable him to bear weight. Dr. McKibbin recommended that plaintiff be evaluated by Dr. Brian Bothe for pain management on an urgent basis. Dr. McKibbin opined that plaintiff's prognosis was uncertain.
9. Dr. Bothe first treated plaintiff on December 7, 2006. Plaintiff presented with complaints of constant pain in the right foot, ankle, and toes, constant pain in the right lower leg, constant pain and tingling over the back of the right knee, intermittent pain in the lower back, and pain in both arms and hands as a result of using crutches. Dr. Bothe prescribed Oxycodone for pain, increased the Neurontin dosage to reduce the nerve-related pain aspects, prescribed Lidoderm local anesthetic patches to place over the foot and ankle, instructed plaintiff in some general, active range of motion movements for the ankle and foot, and scheduled a series of five (5) to six (6) lumbar sympathetic blocks to be done fairly close together to determine if that would help further reduce plaintiff's symptoms.
10. During a follow-up visit on December 14, 2006, plaintiff reported having had three (3) sympathetic blocks and only slight, temporary improvement. Dr. Bothe changed his prescription to OxyContin, decreased his Oxycodone to a maximum of three (3) tablets per day, continued his Neurontin, and recommended that plaintiff proceed with the remainder of the two (2) sympathetic blocks. Dr. Bothe also recommended that plaintiff go to physical therapy. Dr. Bothe's assessment of plaintiff's condition was acute chronic regional pain syndrome of the right lower extremity, chronic right knee pain, and chronic insomnia. *Page 7 
11. Plaintiff returned to Dr. Bothe on December 20, 2006. He reported that the nerve blocks had been helping him progressively, that he was becoming less sensitive to touch, and was having less severe pain. Plaintiff reported that he quit using the OxyContin because he was not getting good pain relief and that he increased his Oxycodone to twelve (12) to fifteen (15) tablets per day. Dr. Bothe counseled plaintiff on proper medication use, reviewed with him the rules of the narcotics agreement, and increased his Oxycodone prescription, allowing him to take twelve (12) to fifteen (15) tablets per day. Dr. Bothe advised plaintiff to continue the use of Lidoderm anesthetic patches and recommended a schedule of gradually tapering the frequency of the sympathetic blocks to try to maintain the gains made from the prior sympathetic blocks.
12. Defendants assigned Ms. Lisa Hollifield as the medical case manager for plaintiff's case. Ms. Hollifield changed plaintiff's treatment to the Center for Occupational Rehabilitation in Asheville, North Carolina.
13. On December 19, 2006, plaintiff underwent an initial therapy evaluation at the Center for Occupational Rehabilitation and gained acceptance into the program. At the Center for Occupational Rehabilitation, plaintiff received treatment from Dr. Richard Broadhurst, a specialist in occupational and environmental medicine, and Dr. Terrence Fitzgerald, a psychologist, while Ms. Janet B. Greene and Mr. George Hall provided physical therapy. The initial therapy plan included physical therapy three (3) times a week for two (2) hours.
14. At the initial therapy evaluation, plaintiff was using crutches and reported that his pain was unbearable without medication. Plaintiff also reported that he would be having scheduling problems through the first of January due to child custody issues and other physician appointments. Between December 19, 2006 and January 8, 2007, plaintiff cancelled two (2) therapy appointments. At his January 8, 2007 therapy session, plaintiff reported an increase in *Page 8 
pain because the medications previously prescribed by Dr. Bothe ran out. The physical therapist recommended a work-hardening program.
15. Also, on January 8, 2007, plaintiff saw Dr. Broadhurst, who diagnosed him as having a right ankle sprain, chronic regional pain syndrome, Type I of the right lower leg, adjustment disorder with anxiety, and de-conditioning. Dr. Broadhurst increased plaintiff's Neurontin, refilled his Oxycodone, prescribing a maximum of eight (8) tablets per day, and prescribed Cymbalta. Dr. Broadhurst also recommended that plaintiff undergo a comprehensive work-hardening program to include continuing his physical therapy, as well as continued consultations with Dr. Fitzgerald.
16. Thereafter, plaintiff began a comprehensive work-hardening program five (5) times per week for three (3) to four (4) hours per day. On or about January 25, 2007, plaintiff's daily work-hardening hours increased to six (6) hours per day, five (5) days per week. Plaintiff continued to have days when he was tardy or had to leave early, and he failed to bring a swimsuit on a few occasions during the time he remained in the program. Plaintiff also complained repeatedly about the severity of his pain, how much it hurt when he was required to walk on the treadmill and his pain keeping him awake at night. On January 31, 2007, plaintiff got agitated with the therapist and walked out. The Full Commission finds, based upon the greater weight of the evidence, that those instances when plaintiff only partially complied with the treatment plan and complained about his pain or an assigned physical therapy activity did not constitute a refusal to cooperate with medical treatment.
17. During therapy at the Center for Occupational Rehabilitation, plaintiff made progress in his ability to bear weight on his right foot. By January 16, 2007, plaintiff was able to ambulate without assistive devices, but his pain complaints continued. *Page 9 
18. On January 16, 2007, plaintiff saw Dr. Fitzgerald, who noted that plaintiff's household included his fourteen (14) year old son, that he had a twelve (12) year old son who continued to reside with his ex-wife, who was an alcoholic, and that plaintiff was considering seeking legal custody of that child as well. As for plaintiff's psychological history, Dr. Fitzgerald noted that plaintiff had experienced two (2) reactive depressive episodes, once in 1995 related to his divorce, and another triggered by the 2000 death of his father.
19. Dr. Fitzgerald performed testing that included the MMPI-II, from which he concluded that plaintiff's depression was grounded to chronic pain and situational stressors, including finances and his children. Dr. Fitzgerald diagnosed plaintiff as having a dysthymic disorder secondary to his work-place injury, maladaptive traits, and a right foot sprain with chronic regional pain syndrome of the right lower leg. Dr. Fitzgerald recommended individual pain and stress management skills training, not to exceed ten (10) sessions, and noted that plaintiff understood that a long-term goal would be to taper and eventually discontinue his use of narcotics. Dr. Fitzgerald subsequently noted his concern that plaintiff's pre-existing psychiatric dispositions and secondary gain issues might compromise the effectiveness of his vocational rehabilitation therapy.
20. On February 1, 2007, Dr. Broadhurst and Ms. Greene noted that plaintiff reported having talked with another physician about his chronic regional pain syndrome, and that this other physician's treatment recommendations were different from what he was presently receiving.
21. Despite making some progress, plaintiff appeared convinced that his pain could only be controlled by narcotic medication and that nobody understood the severity of his pain. *Page 10 
22. On February 7, 2007, plaintiff reported no pain while taking current medications which included Oxycodone, but repeatedly asked that his Oxycodone prescription be refilled. Dr. Broadhurst refilled his Oxycodone prescription and reduced his dosage to six (six) tablets per day. As of February 7, 2007, Dr. Broadhurst concluded that plaintiff's behavior pattern was inconsistent with a desire to return to work.
23. On February 8, 2007, Dr. Broadhurst recommended that plaintiff return to work in the medium level category for four (4) hours per day, with a ramp-up schedule of one (1) hour each week until he reached a maximum of eight (8) hours per day. Dr. Broadhurst restricted plaintiff from working at heights, performing activities that would cause vibration of his right foot, and directed that he alternate between sitting and standing as needed.
24. On February 9, 2007, plaintiff returned to light-duty work for defendant-employer at reduced wages. He drove to work using his left foot. On February 15, 2007, defendants filed a Form 28T, Notice of Termination of Compensation by Reason of Trial Return to Work, indicating that compensation would be paid in varying amounts weekly, and a Form 62 notice of modification of compensation, as defendants began paying temporary partial disability benefits. Following his return to work, plaintiff initially supervised other workers on a job that lasted three (3) to four (4) days. Plaintiff then moved to seated duty, worked approximately twenty (20) hours per week through March 16, 2007, and then eight (8) hours on his last day of work on March 19, 2007.
25. After his return to work, plaintiff returned to Dr. Broadhurst. As part of his team meeting on March 8, 2007, plaintiff reported severe burning pain due to walking on concrete at work and that Oxycodone provided the best relief for the longest periods of time. Plaintiff admitted that he was front-loading his medications, taking most of his daily allowance in the *Page 11 
morning and that on several days he had taken more than the daily amount prescribed. When Dr. Broadhurst voiced his intent to reduce plaintiff's Oxycodone to five (5) tablets a day, plaintiff protested stating, "[y]ou can't do that; I'll be in the Emergency Room; you're taking away the one thing that helps. I'll cut my leg off; this pain is that bad; I can't take this pain." Dr. Broadhurst decreased the Neurontin prescription to one (1) tablet every two (2) days, increased the Cymbalta by one (1) additional tablet per day, prescribed Celebrex, one (1) tablet every twelve (12) hours, and reduced his Oxycodone to five (5) tablets per day as needed. Dr. Broadhurst also directed plaintiff to continue working four (4) hours per day, and to continue physical therapy for two (2) to four (4) hours per visit.
26. On March 15, 2007, plaintiff reported experiencing more pain especially when walking on concrete at work and that he self-limited his physical therapy activities. He also reported that he did not feel he could work and that he was not benefiting from physical therapy. Dr. Broadhurst noted concerns that plaintiff's urinalysis sample might have been diluted. Plaintiff denied diluting his urine. When Dr. Broadhurst informed plaintiff that he planned to release him to return to work at a medium level job and that he was prescribing an Oxycodone taper-off program, plaintiff responded in a profane manner, indicated he wanted to change physicians, and stated that he had already filed such a request with the North Carolina Industrial Commission. The Full Commission finds that plaintiff's conduct is neither justifiable nor excusable.
27. Dr. Broadhurst reduced plaintiff's Oxycodone to a maximum of four (4) tablets per day for the next five (5) days, three (3) tablets per day for the next five (5) days, two (2) tablets a day for the next five (5) days, then one (1) tablet a day for the next five (5) days. In his March 15, 2007 note, Dr. Broadhurst wrote: *Page 12 
 [d]uring today's team meeting, Mr. Israel referred to me in a profane manner and, as such, I will no longer be seeing him as a patient. At his discharge today he was provided a prescription for Oxycodone to wean him from his current level of use down to nothing. He has an adequate supply of other medications. He has already indicated that he will pursue a second opinion, so he may obtain additional medications from this new provider as needed.
Dr. Broadhurst, in effect, reduced plaintiff's Oxycodone from five (5) tablets per day to zero (0) in twenty (20) days. At that time plaintiff, had been taking prescribed Oxycodone for more than three (3) months and was convinced this was the only medication that could help his severe pain.
28. On March 16, 2007, Dr. Broadhurst approved the job description for a position of HVAC mechanic at a medium physical demand level for plaintiff. Dr. Broadhurst noted that plaintiff had reached maximum medical improvement and assigned a zero (0) percent permanent partial disability rating to plaintiff's right foot.
29. After his release to medium-duty work, plaintiff attempted an eight (8) hour workday on March 19, 2007. Plaintiff testified that he could not do the work because he was hurting too badly. Plaintiff's supervisor told him he had to assign work according to the physician's note so plaintiff was not able to get any work accommodations. Plaintiff did not return to work at that time, but he did seek work with defendant-employer after his work restrictions were subsequently modified.
30. In March 2007, plaintiff filed a medical motion requesting to be examined by a specialist for his chronic regional pain syndrome. By Order filed March 29, 2007, plaintiff's motion for a second (2nd) opinion was granted and defendants were ordered to promptly authorize and pay for a one (1) time second (2nd) opinion evaluation with an appropriate specialist of plaintiff's choice. The Order also stated that should the parties be unable to agree *Page 13 
upon the course of plaintiff's future medical treatment following the evaluation, additional direction from the North Carolina Industrial Commission could be sought. Plaintiff chose Dr. Andrew Rudins to perform the evaluation.
31. Also in March 2007, Ms. Lisa Hollifield, the medical case manager assigned to plaintiff's claim, closed her file at defendants' request.
32. Plaintiff returned to Dr. Weiner who had previously been authorized as his treating physician, after his release from the Center for Occupational Rehabilitation program. At the time, no other physician had been provided to him by defendants and his nurse case manager had also been released from his case. On April 2, 2007, Dr. Weiner wrote an out-of-work note indicating that plaintiff was disabled from work due to right leg pain as a result of his chronic regional pain syndrome retroactively to March 20, 2007 and continuing through April 30, 2007.
33. On April 16, 2007, Dr. Weiner prescribed Oxycodone for plaintiff. Defendants denied payment for this medication, stating that Dr. Weiner was not plaintiff's authorized treating physician at that time. Despite having admitted the claim and having knowledge that plaintiff was still suffering from severe pain, defendants refused to provide further medical treatment for plaintiff after he was released from the Center for Occupational Rehabilitation program. Dr. Rudins was only approved by the Industrial Commission to perform a one (1) time second (2nd) opinion evaluation.
34. Defendants conducted surveillance on plaintiff in early April 2007, which showed plaintiff moving about and engaging in activities consistent with his restrictions and reported symptoms.
35. On April 18, 2007, plaintiff was examined by Dr. Rudins for the approved second (2nd) opinion evaluation. Dr. Rudins diagnosed plaintiff as having continued chronic ankle pain, *Page 14 
and he could not rule out the possibility of chronic regional pain syndrome. According to Dr. Rudins, chronic regional pain syndrome is a chronic diagnosis and can vary in both intensity and presentation. The pain typically is at least moderate, often has a burning quality with significant hypersensitivity, and it often causes weight-bearing problems. The condition can get better or worse with time, but it is essentially a permanent condition. Dr. Rudins was of the opinion that walking on a treadmill could aggravate chronic regional pain syndrome.
36. Dr. Rudins recommended that plaintiff undergo a three (3) phase bone scan and a functional capacity evaluation. Dr. Rudins also noted that intermittent sympathetic blocks could be helpful as a pain management tool. Dr. Rudins encouraged plaintiff to continue an active exercise program and recommended sedentary work, but also indicated his intention to re-address plaintiff's work status once the functional capacity evaluation was obtained. However, in his deposition testimony, Dr. Rudins opined that plaintiff was unable to return to his former job with defendant-employer.
37. When plaintiff provided the sedentary work note from Dr. Rudins to defendant-employer, he was informed that no work was available within these restrictions.
38. On May 10, 2007, plaintiff underwent a three (3) phase bone scan, the results of which were negative. Dr. Rudins found no objective evidence that plaintiff had chronic regional pain syndrome; however, he opined that if the notes from Blue Ridge Community Health Center generated five (5) months after his evaluation were accurate, then plaintiff's documented symptoms were indicative of chronic regional pain syndrome.
39. Also on or about May 10, 2007, plaintiff presented to defendants a properly executed Form 28U, Employee's Request That Compensation Be Reinstated After Unsuccessful Trial Return To Work, requesting reinstatement of temporary total disability compensation. The *Page 15 
Form 28U was signed by Dr. Weiner and stated that plaintiff was unable to stand or walk on the job due to an extreme burning pain in his right foot and leg. Plaintiff also submitted to defendants Dr. Weiner's response to some written questions wherein he gave his opinion that plaintiff was incapable of performing his job of heating and air conditioning installation.
40. Defendants refused to reinstate compensation, stating that Dr. Weiner was not an authorized treating physician at the time he signed the Form 28U. Defendants had not authorized any physician to treat plaintiff since Dr. Broadhurst released him in March 2007. Consequently, the Full Commission finds that Dr. Weiner was an authorized treating physician as contemplated by North Carolina Industrial Commission Rule 404A, and he was the only physician treating plaintiff at the time. The Order of the North Carolina Industrial Commission granting plaintiff a one (1) time second (2nd) opinion evaluation did not give Dr. Rudins the status of treating physician, and Dr. Broadhurst's discharge of plaintiff as a patient was not determinative of whether plaintiff needed additional medical treatment, as he even noted that plaintiff could receive additional medication from a different medical provider.
41. The functional capacity evaluation ordered by Dr. Rudins was performed on May 18, 2007. Plaintiff performed at the light-duty level on the functional capacity evaluation and demonstrated 120 minutes standing and sitting tolerance. The results of the functional capacity evaluation indicated that plaintiff gave maximum effort, but his level of performance would not have allowed him to return to his pre-injury HVAC mechanic job as approved by Dr. Broadhurst. Defendant-employer had no work in the light-duty category for plaintiff.
42. Defendants submitted to the Industrial Commission several Form 61 denials of responsibility for payment of medical treatment and medication each time plaintiff sought treatment for conditions already admitted as compensable. These denials did not relieve *Page 16 
defendants of their responsibility to provide reasonably required medical treatment for plaintiff's admittedly compensable injury. Additionally, defendants provided no alternative treatment to what plaintiff was able to find on his own. When Dr. Weiner closed his practice, plaintiff was left with no treating physician.
43. On May 29, 2007, plaintiff went to the emergency department and requested pain medication. Plaintiff stated that he was unable to obtain pain medication from Dr. Rudins or from his previous physicians. The emergency department physician inferred from plaintiff's statements that he had not had any pain medication since March 2007. Plaintiff was prescribed Percocet and questions concerning chronic pain versus drug seeking behavior were noted. Shortly after plaintiff left the emergency room, it received a phone call from his pharmacy indicating that plaintiff had received a prescription for over one-hundred (100) Oxycodone tablets within the past fourteen (14) days, which would have amounted to taking approximately seven (7) tablets per day. This dosage was inconsistent with plaintiff's last prescription, but not inconsistent with dosages that he took in the past. Plaintiff admitted in his testimony that at times, he took more pills per day than prescribed.
44. On June 22, 2007, plaintiff again went to the emergency department, where he was prescribed Percocet and Klonopin.
45. On July 9, 2007, plaintiff returned to the emergency department, and he was again prescribed Percocet and Klonopin. At the time of each of the visits to the emergency department, plaintiff had no treating physician. Plaintiff subsequently qualified for Medicaid and was able to get medical treatment. On September 13, 2007, plaintiff filed a Motion to Reinstate Compensation. *Page 17 
46. Plaintiff sought treatment at Blue Ridge Community Health Center for ankle and foot problems, where he was initially treated by Dr. Vaughn Eskew beginning August 6, 2007. Dr. Eskew examined plaintiff's lower leg, ankle, and foot, and found swelling, discoloration, and skin break down. On October 23, 2007, Dr. Eskew diagnosed reflex sympathetic dystrophy, which is synonymous with chronic regional pain syndrome. Plaintiff's care was then turned over to Mr. Todd Neel, a nurse practitioner who first saw him on November 13, 2007 for pain management. Mr. Neel found plaintiff's reports of pain to be credible, observed signs of what he interpreted to be chronic regional pain syndrome, and recommended that plaintiff seek additional treatment from a pain management physician. Mr. Neel was of the opinion that plaintiff could not work during the time of his treatment due to the severity of his pain. He referred plaintiff to the Pain Center of Hendersonville.
47. Plaintiff sought pain management treatment at the Pain Center of Hendersonville beginning December 10, 2007. Beginning in February 2008, plaintiff's medical provider was Mr. Doug Larner, a nurse practitioner who diagnosed plaintiff as having chronic regional pain syndrome. Mr. Larner managed his medications, and was of the opinion that plaintiff had improved during the course of his treatment, both in function and in the amount of narcotic medication he required. Mr. Larner continued to prescribe Oxycodone for plaintiff through the date of his deposition on June 23, 2008, although the daily dosage had decreased. According to Mr. Larner, plaintiff's consistent drug testing indicated that he was complying with his prescribed medications and that he was not taking illegal or non-prescribed medication. Additionally, Mr. Larner did not observe any secondary gain behavior on plaintiff's part. He was of the opinion that plaintiff should avoid prolonged activity, including prolonged standing due to chronic regional pain syndrome, and that plaintiff needed a spinal cord stimulator. *Page 18 
48. Plaintiff was examined by Dr. Jerry Kotulla, an expert in pain management and anesthesiology, on January 15, 2009. The examination revealed that Plaintiff's foot was still showing some signs of sympathetic over-activity, sympathetic nerve system over-activity, dependent edema in the foot, and his skin showed some mottling. Plaintiff was hypersensitive to touch during the exam. Dr. Kotulla diagnosed plaintiff's condition to be due to causalgia or complex regional pain syndrome II, and was of the opinion that plaintiff had a direct injury to the nerves in his foot which was enhanced by the complex regional pain syndrome II. The wire involved in plaintiff's October 5, 2006 work injury was significant in Dr. Kotulla's assessment of plaintiff's condition and future treatment. He opined that plaintiff's nerve damage was caused when he fell and hit the wire.
49. Dr. Kotulla also opined that plaintiff's chronic regional pain syndrome remains at a level where it can be easily aggravated because plaintiff has injured nerves. Dr. Kotulla believes that plaintiff's pain is genuine, but is of the opinion that treating him with narcotic medications would not be a successful strategy and that plaintiff would end up on a large amount of narcotic medication, probably without much benefit. Dr. Kotulla felt that the nerve damage to plaintiff's foot and the chronic regional pain syndrome would have caused him pain while standing or walking for significant periods of time or when weight-bearing two (2) years prior.
50. Dr. Kotulla was of the opinion that plaintiff's anxiety at the prospect of not being able to have his medications is consistent with all patients in chronic pain and that plaintiff could benefit from a referral for psychological treatment and an occupational therapy evaluation. Dr. Kotulla also described a number of other treatment modalities that could be beneficial. When questioned concerning what defendants characterized as "drug-seeking" behavior, Dr. Kotulla opined that plaintiff may have a pseudo-addiction, which is not an addiction, but in a patient's *Page 19 
mind he believes he gets better relief by seeking more drugs. Dr. Kotulla felt that plaintiff would return to the workforce and a productive life if his symptoms were significantly reduced. The Full Commission gives greater weight to the opinion testimony of Dr. Kotulla over that of Dr. Broadhurst.
51. Plaintiff also received treatment from Ms. Joan Kennedy, a nurse practitioner in the field of pain management, on January 7, 2009. Ms. Kennedy was of the opinion that plaintiff's work capacity was severely limited due to severe pain in his foot affecting concentration and contributing to his depression. She felt the pain was getting worse and was becoming the focus of plaintiff's life. Ms. Kennedy was of the opinion that plaintiff would benefit from a wheelchair to allow him to do more around the house and that walking around in crutches is affecting plaintiff's non-injured left leg due to overuse.
52. According to Mr. Randy Adams, an expert in the field of vocational rehabilitation and vocational evaluation, when considering plaintiff's functional capacity evaluation results, from May 18, 2007 and his limited educational skills, he was not employable at that time. Mr. Adams performed a vocational evaluation of plaintiff on May 11, 2009, which included academic testing. He opined that plaintiff does not have any skills transferable to even sedentary work. Plaintiff's ability to work has been based on his physical ability to perform at the heavy demand level, which he can no longer do. Mr. Adams further opined that since it appears that plaintiff's condition has eroded since 2007, plaintiff remains unemployable. The Full Commission gives great weight to the opinion testimony of Mr. Adams.
53. Based upon the greater weight of the evidence, the Full Commission finds that as a result of his admittedly compensable injury on October 5, 2006, plaintiff also sustained nerve *Page 20 
damage to his right foot and has developed complex regional pain syndrome, Type II as a direct and natural consequence of this injury.
54. The Full Commission further finds as fact, based upon the greater weight of the evidence, that as a result of his October 5, 2006 work injury, plaintiff has been incapable of returning to his pre-injury job or obtaining suitable employment in any other job. Plaintiff's trial return to work was unsuccessful and his search for suitable employment, though reasonable, was also unsuccessful. The Full Commission further finds that it would have been futile for plaintiff to seek suitable employment since his injury, considering his overall medical condition, including the nerve injury to his foot, the severity of his credible pain symptoms, his work restrictions, his limited education, and his lack of transferable skills.
55. The Full Commission further finds that defendants' characterization of plaintiff's pain behaviors as "drug-seeking," which formed the basis of defendants' decision-making in this case, is unpersuasive. The greater weight of the evidence supports Dr. Kotulla's assessment of plaintiff's behavior.
56. The Full Commission finds that plaintiff would medically benefit from assigning Dr. Kotulla as plaintiff's authorized treating physician and following his recommendations for treatment. The treatment provided to plaintiff from all of the medical providers since the termination of his medical compensation has been reasonably required to effect a cure, provide relief, or lessen his disability, and defendants are responsible for payment of the same.
57. Based upon the credible medical and vocational evidence of record, and as a result of his October 5, 2006 admittedly compensable injury by accident, plaintiff has been incapable of earning wages in his former position with defendant-employer or in any other employment in the competitive marketplace for the period from October 5, 2006 through the *Page 21 
present and continuing. The actual wages plaintiff earned upon his trial return to work are not indicative of wage-earning capacity in the competitive employment market.
58. Plaintiff's testimony in this case concerning his pain level since the date of his October 5, 2006 work injury is found to be credible.
60. Defendants were obligated to reinstate compensation when plaintiff demonstrated that his trial return to work was unsuccessful. At the time plaintiff left work, he had not worked a forty (40) hour week, and after working one (1) eight (8) hour day, he reported to his supervisor that he could not do the work due to pain related to his compensable work injury. Dr. Weiner satisfied the requirements of North Carolina Industrial Commission Rule 404A, as he was one of plaintiff's authorized treating physicians.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On October 5, 2006, plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment with defendant-employer to his back, right foot, ankle, knee and leg knee. N.C. Gen. Stat. § 97-2(6).
2. Once defendants admitted the compensability of plaintiff's October 6, 2006 work injury, which was to his back, right foot, ankle, knee and leg, the burden of proof shifted to defendants to prove that there is no causal relationship between any medical treatment plaintiff subsequently required relating to these body parts and the original work injury. Parsons v. Pantry,Inc., 126 N.C. App. 540, 485 S.E.2d 867 (1997). However, defendants failed to meet their burden of proof in this case.Id. *Page 22 
3. As a result of his admittedly compensable work injury on October 5, 2006, plaintiff sustained nerve damage to his right foot and has developed Complex Regional Pain Syndrome, Type II as a direct and natural consequence of this injury, which is also compensable. Roper v. J.P. Stevens Co.,65 N.C. App. 69, 308 S.E.2d 485 (1983), disc. rev. denied,310 N.C. 309, 312 S.E.2d 652 (1984).
4. As a result of his October 5, 2006 work injury, plaintiff has been incapable of returning to work in his pre-injury job or obtaining suitable employment in any other job. Plaintiff's trial return to work was unsuccessful and his search for suitable employment, though reasonable, was also unsuccessful. The evidence establishes that it would have been futile for plaintiff to seek suitable employment since his October 5, 2006 work injury, considering his overall medical condition, including the nerve injury to his foot, the severity of his credible pain symptoms, his work restrictions, his limited education, and his lack of transferable skills. Russell v. Lowe's Product Distribution,108 N.C. App. 762, 425 S.E.2d 454 (1993).
5. Based upon the credible medical and vocational evidence of record, and as a result of his October 5, 2006 admittedly compensable injury by accident, plaintiff is entitled to be paid by defendants ongoing temporary total disability compensation at the rate of $304.20 per week for the period of October 6, 2006 through the present and continuing until such time as he returns to work, or further Order of the North Carolina Industrial Commission. N.C. Gen. Stat. § 97-29.
6. As a result of his October 5, 2006 admittedly compensable injury by accident, plaintiff is entitled to have defendants pay for all related medical expenses incurred or to be incurred, subject to the provisions of N.C. Gen. Stat. § 97-25.1, when the medical bills have been approved according to established North Carolina Industrial Commission procedures. Plaintiff is *Page 23 
entitled to reimbursement for medical expenses incurred which were related to his compensable injury. N.C. Gen. Stat. §§ 97-25; 97-25.1.
7. The Full Commission concludes that plaintiff would medically benefit from assigning Dr. Kotulla as plaintiff's authorized treating physician, and from following his recommendations for treatment, including the comprehensive pain management program at Carolina Multi Medical Care and their medical providers. N.C. Gen. Stat. § 97-25.
8. Defendants were obligated to reinstate compensation when plaintiff demonstrated that his trial return to work was unsuccessful, pursuant to N.C. Gen. Stat. § 97-32.1. "There is no language in the General Statutes or in the IC Rules which mandates that the employee file a form with the Industrial Commission, Form 28U or otherwise, in order to have the employee's benefits reinstated." Burchette v. East Coast MillworkDistributors, Inc.,149 N.C. App. 802, 808, 562 S.E.2d 459, 463 (2002). Dr. Weiner was "one of the employee's authorized treating physicians." I.C. Rule 404A.
9. Defendants are entitled to a credit or offset for wages paid to plaintiff as a result of his unsuccessful trial return to work and the temporary total and temporary partial disability compensation already paid to plaintiff.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD
1. Defendants shall pay to plaintiff ongoing temporary total disability compensation at the rate of $304.20 per week for the period of October 6, 2006 through the present and continuing until such time as plaintiff returns to work, or further Order of the North Carolina *Page 24 
Industrial Commission. From the amounts having accrued, this compensation shall be paid to plaintiff in a lump sum. This compensation is subject to the attorney's fee approved herein and the credit to defendants for wages paid to plaintiff as a result of his unsuccessful trial return to work and the temporary total and temporary partial disability compensation already paid to plaintiff.
2. Defendants shall pay for all related medical expenses incurred or to be incurred by plaintiff when the medical bills have been approved according to established Industrial Commission procedures.
3. A reasonable attorney's fee of twenty-five (25) percent of the compensation awarded herein is approved for counsel for plaintiff. From the compensation having accrued, this fee shall be deducted from the amounts due plaintiff and paid directly to counsel for plaintiff, with counsel for plaintiff receiving every fourth (4th) check thereafter.
4. Defendants are allowed a credit offset for wages paid to plaintiff as a result of his unsuccessful trial return to work and the temporary total and temporary partial disability compensation already paid to plaintiff.
5. This case is hereby assigned to Karen Smith, R.N., director of the Nurses Section at the North Carolina Industrial Commission, for assignment of a nurse to manage this case. Plaintiff shall cooperate with the assigned nurse.
6. At the appropriate time, defendants shall provide vocational rehabilitation assistance to plaintiff.
7. Defendants shall pay the costs.
This the 26th day of February 2010. *Page 25 
 S/___________________ STACI T. MEYER BERNADINE S. BALLANCE COMMISSIONER
 CONCURRING: S/___________________ PAMELA T. YOUNG CHAIR
 S/___________________ STACI T. MEYER COMMISSIONER